**IN RE ASBESTOS, CATALYST, AND SILICA TOXIC DUST
EXPOSURE LITIGATION.
This Opinion Pertains to the Cases Designated as Group A.**

Master Case No. SX-15-CV-096

Superior Court of the Virgin Islands

Division of St. Croix

August 23, 2017

J. RUSSELL B. PATE, ESQ., The Pate Law Firm, St. Thomas, USVI, KOREY A. NELSON, ESQ., KATIE K. MCGUIRE, ESQ., ALAYNE K. GOBEILLE, ESQ.,[*] C. JACOB GOWER, ESQ.,[*] Burns Charest LLP, New Orleans, LA, WARREN T. BURNS, ESQ., DANIEL H. CHAREST, ESQ., Burns Charest LLP, Dallas, TX; STEPHEN MURRAY, SR., ESQ.,[*] STEPHEN MURRAY, JR., ESQ.,[*] DEVIN A. LOWELL, ESQ.,[*] Murray Law Firm, New Orleans, LA, *For Plaintiffs.*

---

[*] Admitted pro hac vice.

CARL A. BECKSTEDT III, ESQ., Beckstedt & Associates, Christiansted, USVI, *For Hess Oil Virgin Islands Corporation and Hess Corporation, Defendants.*

MOLLOY, *Judge*

## MEMORANDUM OPINION

### (August 23, 2017)

**BEFORE THE COURT** is a motion filed by Defendants Hess Oil Virgin Islands Corporation ("HOVIC") and Hess Corporation ("Hess") to extend the discovery deadlines in the twelve cases ("Group A cases") selected to begin jury selection and trial at the end of the year as bellwethers for a much larger group of cases. Defendants assert that "the fact discovery that remains to be completed for the Group A Plaintiffs will take *at least* six and up to nine months under a best case scenario with both sides continuing to push multiple depositions and inclusive of medical depositions." (Defs.' Emergency Mot. to Extend June 30 Fact Disc. Deadline & Other Deadlines Accordingly Re: Group A Cases 12, filed July 5, 2017 (hereinafter "Mot.").) Plaintiffs oppose, countering that "the 122 aging Plaintiffs in this case should not be prejudiced by Defendants' failure to zealously defend these cases and to devote appropriate resources." (Pls.' Opp'n to Defs.' Emergency Mot. to Extend Deadlines and Move Trial Date 4, filed July 17, 2017 (hereinafter "Opp'n").) The Court heard argument on August 14, 2017 and from the bench granted in part and denied in part Defendants' motion. This memorandum opinion and the accompanying order follow to reduce that decision to writing and the reasoning in support. *See* V.I. R. CIV. P. 85.

## I. BACKGROUND

On December 19, 2013, sixty-five people filed sixty-five "master" complaints in the Superior Court of the Virgin Islands against Hess and HOVIC for negligence. Plaintiffs allege they were exposed to asbestos during the years they worked at the former oil refinery on St. Croix. Except for the numbers assigned by the Clerk's Office,[1] the complaints

---

[1] Shortly before the 2013 cases were filed, the Superior Court of the Virgin Islands implemented a new case management system (AiCMS), which also included a new system for numbering cases with codes specific to the type of case. The sixty-five cases filed on De-

were identical. The Clerk's Office randomly assigned all sixty-five cases as a set to the undersigned judge. On May 17, 2014, another sixty-two "master" complaints were filed for sixty-two more people. The Clerk's Office assigned this second set of cases at random to another judge.

Defendants responded to both "sets" of cases by filing the same two motions: a motion to dismiss for failure to state a claim for relief and a motion to stay pending a ruling on the motion to dismiss. Plaintiffs filed responses in opposition to the motions to dismiss and further sought leave to supplement the master complaints with what they referred to as "Schedule A," to provide additional allegations about their prior work histories, their dates of birth, and dates of their diagnoses with interstitial lung disease. This Court heard argument on January 23, 2015 in the first set of cases and from the bench granted Defendants' motions to dismiss and denied as moot the motions to stay. The Court determined that commencing civil actions by a master complaint with global allegations as to all plaintiffs and all defendants, but without any allegations specific to each plaintiff and each defendant, was improper. Plaintiffs' attempt to supplement the complaint with allegations about events that occurred before they filed the "master" complaint was also improper. Pleadings can be supplemented, but to add allegations about events that occur after the complaint has been filed, not before. *Cf. Brady v. Cintron*, 55 V.I. 802, 812 n.11 (V.I. 2011). However, since leave to amend would not have been futile, the Court construed Plaintiffs' motion to supplement as a motion for leave to amend, and granted it. Plaintiffs were given thirty days to refile individual amended complaints.

Around the same time, the Administrative Judge of the Superior Court scheduled and then held a global status conference to discuss with counsel options for more efficiently managing the complex and toxic tort cases pending in the St. Croix District. *See generally In re Alumina Dust Claims*, 67 V.I. 172 (Super. Ct. 2017); *Willie v. Amerada Hess Corporation*, 66 V.I. 23, 35 (Super. Ct. 2017). During the status

---

cember 19, 2013, the first cases filed in the new system, were initially numbered SX-13-TRT-1 through SX-13-TRT-065, with case type "TRT" referring to tort. However, a few months later, the AiCMS system proved unworkable and the vendor, AMCAD, exited the judicial software business. Consequently, the Superior Court had to revert to its prior electronic case management system, eNACT. Because the new case type codes were not available in the prior system, the Clerk's Office had to renumber the TRT case numbers with "CV" case numbers. The 2014 cases were filed after eNACT had already been resurrected.

conference, counsel for Plaintiffs and counsel for Defendants represented that the second set of cases filed in 2014 could be coordinated together with the set filed in 2013 for pre-trial purposes. With the consent of the undersigned judge — and later with the approval of the Presiding Judge, *cf. Alumina Dust Claims*, 67 V.I. 172; *see also* Order, entered Nov. 9, 2015 — the Administrative Judge reassigned the 2014 cases to the undersigned judicial officer, directed the Clerk to open a master case captioned *In re Asbestos, Catalyst, and Silica Toxic Dust Exposure Litigation*, and consolidated the 2013 and 2014 cases (127 cases in total) under the *Toxic Dust Exposure* master case for pretrial purposes.

Once the 2014 cases were reassigned, this Court immediately issued an order to resolve the motions to dismiss, to stay, and for leave to file a supplemental Schedule A similar to the 2013 cases. The Court also issued a case management order and then a scheduling order in the master case to govern pre-trial matters. After later hearing argument from counsel on how best to manage all the individual cases simultaneously, the Court resolved to take a somewhat different approach than those advocated by counsel. Hess and HOVIC had insisted on taking a "routine" approach: full discovery in each case and then mediation. (*See* Hr'g Tr. 12:12-18 (Aug. 26, 2015) ("MS. BENOIT: Defendant[s] essentially envision, your Honor, completing discovery in all the case[s], that include[s] written discovery, depositions and day minimum [sic], the exchange of plaintiffs' expert reports. THE COURT: In what time frame? MS. BENOIT: However long it takes to get that done." (formatting altered)); *id.* at 14:18 ("MS. BENOIT: After discovery is complete, your Honor, mediation would be scheduled.").) Plaintiffs, by contrast, insisted on taking the "domino" approach: only a few cases needed to go forward and the rest could be stayed after minimal discovery because, once a few cases were tried and multi-million dollar judgments awarded, Defendants would settle all the other cases. *See id.* at 8:21-9:8 ("[W]hen the first bellwether case is tried that will solidify the liability argument with whatever the jury decides. And then if we need to have two other trials after that we can do those trials, but . . . the vast amount of cases show that after a bellwether trial or two the group resolves. THE COURT: So what happens after discovery with the remaining one hundred and eight cases? MR. PATE: If — if the three bellwether cases are tried and the defendants continue to want to try the other cases we need to setup another group of bellwether cases out of the group."). In other words, Defendants wanted full

discovery in all the cases while Plaintiffs wanted as little discovery as possible in the fewest number of cases. This Court split that baby and took the middle approach.

Mindful of the Superior Court's limited resources, the Court decided upon a tracked approach. All Plaintiffs were ordered to submit to a medical examination by a physician or other medical professional chosen by Defendants. Both sides were ordered to exchange written discovery, including authorizations by Plaintiffs for the release of their medical records. Once both conditions were met — Plaintiffs examined and written discovery exchanged — the cases would be assigned to different tracks. Twelve cases, four selected by Plaintiffs' counsel and four selected by Defendants' counsel — would be designated as Group A along with another four chosen by the Court at random.[2] The remaining cases were designated as Group B. The Group A cases would be a bellwether and would proceed at a faster pace, while the Group B cases continued forward, but at a slower pace. Plaintiffs' request to stay those cases that were not selected as the bellwether was rejected. Cf. id. at 9:23 ("MR. PATE: Yes. The hundred eight cases we would turn over initial discovery disclosure to written discovery, and then after that they will be stayed.").

Counsel jointly submitted the list of eight cases on August 8, 2016.[3] By order entered August 23, 2016, the Court notified the parties of the four cases the Court had chosen by random and further designated all twelve as Group A. The Court also issued an Amended Scheduling Order the same day to govern discovery in the Group A cases, with fact witness depositions to be completed by June 30, 2017 and expert depositions taken by July 28, 2017. For the Group A cases, jury selection and trial

---

[2] The Group A cases include *Gregor Calixte v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-435; *Thomas Casimir v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-444; *Thomas M. Charles v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-169; *Anthony Frank v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-488; *Linus Gilbert v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-490; *Pius J. Hubert v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-192; *Donat Joseph v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-460; *Isidore Jules v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-199; *Rosemary Nicholas v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-430; *Wilfred St. Thor v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-458; *John B. Sonson v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-453; and *Andrew Wilson v. Hess Oil Virgin Islands Corporation, et al.*, SX-13-CV-480.

[3] Counsel were directed to submit the list jointly so that the record did not disclose who chose which cases.

would begin on November 27, 2017 and continue through January 2018 until all were tried, unless a global resolution was reached before then. Otherwise, the Group B cases would proceed forward.

It is against this backdrop that Hess and HOVIC, on July 5, 2017, filed an emergency motion to extend the June 30th discovery deadlines for the Group A cases by "nine months, with all other deadlines moved thereafter," including jury selection and trial. (Mot. 1.) Plaintiffs filed a response in opposition on July 17, 2017. Defendants filed their reply on July 31, 2017. The Court heard oral argument on August 14, 2017 and ruled on Defendants' motion from the bench.

## II. DISCUSSION

■ When a court opens a master case and groups multiple cases under the master case, it signals that the traditional approach to managing cases is not just, efficient, or feasible. Here, 127 individual cases were initially grouped together under this master case: sixty-five filed in 2013 and sixty-two filed in 2014. Four cases were dismissed voluntarily by stipulation,[4] leaving 123 cases still to be resolved. Yet, Defendants have proceeded as if the master case were the case, not the 123 cases grouped under it. It is not. *Cf. Edwards v. Hess Oil V.I. Corp.*, 66 V.I. 218, 226 (Super. Ct. 2017) ("A master case is not really a case, not in the true sense. Summons does not issue in a master case. The master case does not proceed to trial. Judgment is not entered in a master case. A master case cannot be dismissed on motion.") (quoting *Mitchell v. Gen. Eng'g Corp.*, 67 V.I. 271, 288 (Super. Ct. 2017)). Moreover, there is no right to have a master case opened. "Rather, a court opens a master case as *a judicial convenience* so that multiple cases with similar claims or parties can be coordinated under a common case file and docket and litigation streamlined and simplified." *Id.* at 226 (emphasis added) (citation omitted). Thus, the Court could have managed the individual cases individually, rather than collectively. This point is crucial here because it underscores the lack of resources Defendants have allocated to defending these cases.

---

[4] The cases dismissed by stipulation were *Daniel Codrington v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-173; *Helino Cruz v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-175; *Julian Micheau v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-206; and *Marcia Theophilus v. Hess Oil Virgin Islands Corporation, et al.*, SX-14-CV-221.

But first, the Court must acknowledge the work both sides have performed to date in furtherance of the Court's orders and in anticipation of the upcoming trial date.

> The parties have exchanged initial and supplemental written discovery among all 122 Plaintiffs, produced approximately 46,000 pages of combined documentary evidence; (as of *last week*) completed depositions and medical examinations of all twelve Group A Bellwether Plaintiffs; completed depositions of both Defendants; deposed 34 of over 110 Group A fact witnesses, not including medical providers; and have deposed 15 Group B Plaintiffs. However . . . critical fact discovery remains outstanding and necessary to prepare for trial and there simply is not enough time. Notwithstanding Defendants' diligence, the deadlines set forth in the scheduling order cannot reasonably be met.

(Mot. 1-2 (footnotes omitted).)

Thus, Defendants begin their motion on solid ground. They further solidify their position by detailing counsel's efforts at resolving this motion with opposing counsel before filing it with the Court, something mandated by the Case Management Order:

> The week of this filing, the Parties' counsel met and conferred in person and followed up via telephone regarding the scheduling issues raised in this motion. Plaintiffs are aware of the Defendants' position and the Parties have agreed to continue discussions. But, as of this filing, the Plaintiffs have indicated that while they generally do not object to allowing fact depositions and discovery to continue through mid to late August . . . Plaintiffs refuse to agree to extend any other deadlines and will not agree to a continuance of the trial date. Plaintiffs also insist that their position is they want to try all 12 bellwether Plaintiffs at once commencing on the November 27, 2017, trial date.

*Id.* at 2.

Additional examples Defendants offer as good cause for extending discovery and continuing trial for the Group A cases include that fact witnesses, such as former co-workers of the plaintiffs and family members of the plaintiffs either live on the mainland or have relocated there, which will require travel off-island; that employment records still

have to be gathered for the Group A Plaintiffs; and that expert witnesses still must be disclosed and deposed.

> There are at least 20 medical depositions. Some doctors will take a whole day as they may have seen multiple Plaintiffs. We will also have to work around their schedules. While such depositions cannot typically be scheduled back to back. It will likely take up to two months to complete those depositions — *once we have all the records.* . . . Then there are Fact Witnesses . . . company witnesses, contractor witnesses, co-worker witnesses, co-worker/Group B Plaintiffs and family witnesses. At least one company witness is a Party Representative. Insofar as these depositions are so spread throughout the United States, there will have to be multiple travel dates. At a minimum, the reality is that the witnesses will likely consume at least two weeks of travel during at least two months. And, this does not take into account scheduling issues.

*Id.* at 13.

Defendants also note a very practical concern that "while Plaintiffs have at least eight attorneys of record participating in the discovery and preparing for trial, Defendants currently have two attorneys. . . . That being said, with the [Virgin Islands] Supreme Court's recent change in the requirements for *pro hac vice* admission, at least two attorneys will be added to the defense team to assist in completing discovery and trial preparation." *Id.* at 12.

Lastly, Defendants offer up mediation as further support for continuing the discovery and trial dates.

> The parties have revisited trying a second mediation. . . . While a mediation may itself take one or two days, the effort that goes into the pre-reporting, pre-briefing, pre-client counselling, etc., takes time. Thus, that two [sic] plays into the need for an extended schedule that allows the parties (and especially their counsel) to give the effort required to give the greatest opportunity for a successful resolution at mediation.

*Id.* at 14.

In response, Plaintiffs reject each ground that Defendants offered for good cause. Plaintiffs contended that as of

January 4, 2016, Plaintiffs had served discovery responses and authorizations for all but one bellwether plaintiff, and Plaintiffs completed that process for the bellwethers on February 21, 2016. Thus, with respect to Mr. Charles, Defendants have had an authorization form for over 18 months. What explains Defendants failure to obtain medical records for Mr. Charles over the past 18 months? Defendants claim that the substitution of current counsel on September 29, 2016 — *nearly ten months after receiving the authorization form* — complicated their efforts and excused their failure to obtain the records. Defendants fail to plead with any specificity what they did for ten months to obtain Mr. Charles records. In fact, Hess and HOVIC are on record as stating they only needed four-to-five months to get medical records . . . for each Plaintiff.

(Opp'n 5 (quotation marks and footnotes omitted).)

Plaintiffs also reject Defendants' argument that defense counsel needs more time because of the amount of work left to do.

There is no dispute that Hess and HOVIC were properly hailed into court in this litigation. And with 122 litigants in this consolidated proceeding alone, the Defendants' cannot credibly maintain that they did not understand the complexity or importance of this dispute. This is not the first time Defendants have been sued by . . . [persons who] work[ed] inside the Hess Refinery. Nevertheless, Defendants' now argue that they should not be required to complete discovery within the time remaining before trial because they only have two lawyers (though, we are told, more are on the way) and they are outnumbered. This argument strains credulity.

Hess closed the year 2016 with over 527 billion dollars in assets, having received over $5 billion in revenue during that year alone. Defendants have significant resources and have spent decades defending against complex cases just like this one. Moreover, it has been clear since early in this litigation that Defendants' on-island attorneys have been assisted by the Wilson Elser firm — whether or not members of that firm actually appeared before this Court as counsel of record. As early as July 27, 2016, Wilson Elser staff were involved in obtaining medical and work records. Wilson Elser is the 50th largest law firm in the United States with over 745 attorneys.

553

The simple truth is that Defendants have long had more than enough resources to engage in any type of discovery they choose — they have just failed to employ those resources. During the nearly four years this case has been pending, Defendants chose not to engage other attorneys (or to have their stateside counsel appear), despite Herculean discovery tasks Defendants' now outline before this Court as necessary for a fair trial. That was Defendants' choice — just like any civil litigant may ultimately choose whether and how to litigate any particular case. But, of course, there are consequences inherent to any decision. It would be incredibly unfair for this Court to reward such litigation artifice by continuing the bellwether trials.

In contrast, Defendants are correct in pointing out that Plaintiffs have staffed these cases appropriately. Four of Plaintiffs' stateside attorneys took the bar exam and [have] become members of the U.S. Virgin Islands Bar. Four other attorneys have appeared *pro hac vice*. This Court should not reward the Defendants for making a mockery of these proceedings by failing to mount an appropriate defense and then seeking to delay trial by more than a year.

*Id.* at 8-9 (footnotes omitted).

Finally, Plaintiffs reject Defendants' suggestion that a second mediation is good cause for continuing the trial dates. "It is entirely common — indeed the norm — for parties to engage in such discussions as the date of trial looms," Plaintiffs explain. *Id.* at 9. But now is "the time when the Court needs to keep both sides' feet to the fire." *Id.* Otherwise, "[d]elaying bellwether trials for what will likely be over one year will strike a heavy blow to the Parties' settlement interest efforts." *Id.*

In reply, Defendants counter that "[i]f the trials of the twelve Group A Plaintiffs are truly going to serve as a bellwether for purposes of valuing and resolving the over 500 refinery-based asbestos/dust-related cases now pending before the Superior Court, then allowing those twelve cases to be fully developed is a paramount consideration." (Defs.' Reply to Pls.' Opp'n to Defs.' Mot. to Extend Deadlines and Move Trial Date 1, filed July 31, 2017 (hereinafter "Reply").) Defendants then seek to drive home their most important point:

the facts and merits of Plaintiffs' claims vary greatly as to employment history, alleged exposure, duration and proximity, medical history, co-

workers, fact witnesses, and the cause of action. The defense of these matters necessitates that each claim is its own story, and even though these twelve bellwethers are bundled together, fundamental fairness and due process require that full attention is given to the[ir] individual stories . . . recognizing that they are stand alone, individual claims.

*Id.* at 3. Defendants buttress this point, explaining that since filing their motion,

> there has been more discussion between the parties with respect to mediation. Currently, the discussion around mediation has widened to include mediating a resolution of the claimants in this case (both Groups A and B) **_and_** all other asbestos/silica/dust cases filed against Hess and HOVIC by the same counsel (i.e., over 500 individual cases). Needless to say, an undertaking of this size will take significant effort, and the mediation process will take much longer than just two days. For a case like this it will take an enormous amount of focus to develop a matrix/framework that tends to the needs of all stakeholders. Obviously, if the possibility of a large-scale mediation of over 500 claimants is on the table, the parties' legal attention and economic resources must be diverted to achieve that end. Delaying the trial to achieve settlement is not rewarding what the Plaintiffs call HOVIC and Hess's "inexcusable neglect." Rather if settlement is successful, it would not only be beneficial to the parties, but also to the Court — as 500 *plus* cases would be cleared from the docket with minimal judicial resources being expended.

*Id.* at 9.

Returning to the realities of litigation in the twenty-first century, Defendants claim they "are still awaiting records from approximately 80 of the bellwether Plaintiffs' numerous medical providers," records are "critical to HOVIC and Hess's defense." *Id.* at 11. "Arguably, both sides have been diligent in working to complete discovery," Defendants state, "but the simple fact is that the volume of information and the varying sources of that information requires more time to complete discovery." *Id.* Here, more time is necessary, Defendants explain, because the "medical providers are outside the control of Hess and HOVIC." *Id.* "Hess and HOVIC cannot control when it receives the records requested with signed authorizations." *Id.*

■ "Continuances of trials, conferences, other scheduled hearings, whether by motion of one party or by stipulation of all parties, will not be routinely granted, but will be granted only upon a demonstration of good cause." V.I. R. CIV. P. 6-3(a). " 'Excusable neglect' and 'good cause' are essentially synonyms" under Virgin Islands law. *Fuller v. Browne*, 59 V.I. 948, 954 (V.I. 2013) (citing *Beachside Assocs., LLC v. Fishman*, 53 V.I. 700, 713 (V.I. 2010)). Determining whether good has been shown is

> at bottom an equitable [determination], where the court should take into account all relevant circumstances surrounding the omission including the danger of prejudice to the opposing party, the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith. Prejudice to the nonmoving party encompasses, among other things, the loss of opportunity to present some material aspect of a case, the expenditure of money or similar detrimental changes in position by one side in reliance on the action or inaction of the other, and the imposition of additional trial preparation, and added expense. Any delay that affects the Superior Court's ability to manage its docket as a whole weighs against a finding of excusable neglect. And delay entirely within the movant's control — such as when the movant makes a conscious decision to pursue one litigation strategy at the expense of another — does not support a finding of excusable neglect.

*Greene v. V.I. Water & Power Auth.*, 67 V.I. 728, 739 (V.I. 2017) (quotation marks, ellipses, brackets, and citations omitted).

As stated from the bench, both sides have been diligent in moving these cases forward and in resolving disagreements and disputes on their own. In fact, considering the number of cases grouped under this master case and the complexity of the litigation, only twenty-one motions have been filed to date in the master case, some of which were denied as moot or deemed withdrawn because counsel later resolved the issues themselves. Another six were ordered refiled in the individual cases because they concerned individual cases, not the master case. The remaining motions either sought extensions of time or leave to file confidential documents under seal. That this is the first opinion the Court has had to issue in the master case speaks volumes. There is no question about the diligence on both sides. But Hess and HOVIC have not asked

for more time because they need to review the information they have gathered to date to prepare for trial. Rather, they request more time because they want to obtain further information. Therein lies the problem.

■■ At the outset of this litigation, two attorneys appeared before the Court: one law firm on each side. By the second status conference held on March 23, 2016, four attorneys had appeared for Plaintiffs from three different law firms. By the fourth status conference held on March 29, 2017, seven attorneys had appeared for Plaintiffs, also from the same three law firms. Although Defendants' counsel changed over the course of litigation, the number of law firms remained the same: one. Twice, the Court pointed out the lopsidedness, albeit in a joking manner. (*See* Hr'g Tr. 4:3-4 (Mar. 23, 2016) ("THE COURT: Okay. Just by yourself? MS. BENOIT: Yes."); Hr'g Tr. 3:21-22 (Mar. 29, 2016) ("THE COURT: Just you alone? MR. BECKSTEDT: Just me.").) Generally, courts do not have a say in who the parties retain to represent them or how adequately each side staffs a case. But, as Plaintiffs point out, "there are consequences inherent" in such decisions. (Opp'n 9.) Parties " 'cannot avoid the consequences of the acts or omissions of [their] freely selected agent.' " *V.I. Taxi Ass'n v. V.I. Port Auth.*, 67 V.I. 643, 696 (V.I. 2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 634, 82 S. Ct. 1386, 8 L. Ed. 2d 734 (1962)). Parties also cannot avoid the consequences of not ensuring that their attorneys have adequate resources to meet court-imposed deadlines. Even though Defendants' counsel has done a commendable job here, Hess and HOVIC are the parties, not their attorney. *Accord Daniel v. Borinquen Ins. Co.*, SX-98-CV-192, 2017 V.I. LEXIS 117, at *17 n.11 (Super. Ct. June 28, 2017) ("All too often counsels conflate each other with their clients. Cases, and arguments raised in cases, belong to the parties, not the attorneys."). The Court cannot reward Defendants for insufficiently staffing these cases or not dedicating appropriate resources to ensure that the parties met court-issued deadlines. This factor clearly weighs against a finding of good cause. *Cf. Greene*, 67 V.I. at 739 ("[D]elay entirely within the movant's control — such as when the movant makes a conscious decision to pursue one litigation strategy at the expense of another — does not support a finding of excusable neglect." (citation omitted)).

■■ Timing is another factor in determining good cause. *See* V.I. R. CIV. P. 6-3(a). It is true that Defendants recently substituted their former counsel for their current counsel on September 30, 2016. The Court

approved that stipulation on October 5, 2016. Admittedly, substitution of counsel occurred less than a year ago. Similar to judges, attorneys take over cases from their predecessors as they find them. *Cf. In re Estate of George*, 59 V.I. 913, 920-21 (V.I. 2013) (judges who take over cases can reexamine prior orders if appropriate); *see also Smith v. Michael*, 113 Md. 10, 77 A. 282, 286 (1910) ("Courts must deal with cases as they find them."); *Kerns v. State*, 265 Ind. 39, 349 N.E.2d 701, 703 (1976) ("The very best of lawyers are limited to working with their cases as they find them."). Should counsel need additional time to review the case file, to meet with the client, or to conference with opposing counsel — the time to request additional time or to request that existing deadlines be adjusted is when the substitution occurs, not months later and certainly not a few months shy of trial. Had Defendants asked the Court in October 2016 to extend the discovery deadlines and continue the trial date because their new counsel needed time to assess these cases, take possession of the clients' files from prior counsel, and obtain re-executed authorizations from Plaintiffs for the release of their medical records, the Court might have found good cause. But here, Defendants filed their emergency motion on July 5, 2017 — six days after the June 30th deadline for discovery had passed. Here, the timing of Defendants' motion weighs against a finding good cause.

■ But the most important factor weighing against good cause is the fact that "[a]ny delay that affects the Superior Court's ability to manage its docket as a whole weighs against a finding of excusable neglect." *Greene*, 67 V.I. at 739 (citation omitted). "[T]he overriding principle at stake involves the trial court's ability to mitigate the scourge of litigation delays by setting deadlines *to force* parties and their attorneys to be diligent in prosecuting their causes of action." *Id.* (quotation marks and citation omitted) (emphasis added). Hess and HOVIC ask the Court to extend — but really they mean to stay — discovery and trial in the Group A and Group B cases so that the more than 500 cases now pending in the Superior Court against them can possibly be mediated globally. First, not all 500 cases are assigned to this judicial officer. Second, the majority of these cases are not subject to this master case.

This Court is certainly "aware . . . that, since 2013, plaintiffs[' counsel] have filed 458 new asbestos cases against Defendants, including the cases consolidated before this Court." (Opp'n 4.) As another Superior Court judge observed recently, "the *status quo* cannot continue," considering

that the number of toxic tort/complex litigation cases pending in the Superior Court "exceeds a thousand." *Edwards*, 66 V.I. at 230. But one point *Edwards* makes is particularly relevant for this case: that "[o]ur courts have not instituted any procedures specific to asbestos litigation or to complex litigation in general other than grouping certain individual cases together under a master case and even then on an *ad hoc*, case-by-case basis often *at the behest of counsel." Id.* at 229 (emphasis added). If this Court continued the trial date in even one Group A case at the behest of counsel — and based on unsworn statements in motion papers, suggesting that maybe someday soon a mediation will go forward globally in over 500 cases — then this Court would effectively be surrendering control over its own docket to the convenience of counsel. *Accord Rivera-Mercado v. Gen. Motors Corp.*, 51 V.I. 307, 318 n.3 (V.I. 2009) (Swan, J., concurring) (" 'If we were to grant a continuance because of the actions of plaintiffs and their counsel, we would sadly surrender what control we still have over the Court's calendar. We are already faced with an understaffed judiciary in this district, with criminal cases, multiple asbestos cases, multiple typhoid cases, and major products liability cases, all clamoring for the Court's trial time. To suggest that we simply delay the case herein for the convenience of counsel borders on insult.' " (quoting *Couch v. St. Croix Marine, Inc.*, 23 V.I. 269, 272 (D.V.I. 1987))). Defendants' suggestion is laudable — mediating all the cases globally. But this Court cannot stay or delay the deadlines set in these cases based on Defendants' good intentions or based on cases assigned to other judges that may or may not be mediated one day.

Even though Defendants have not shown good cause to extend discovery by six to nine months and to extend trial in one or more of the individual cases by another six to nine months, Defendants have demonstrated good cause for a partial extension. By order entered July 19, 2017, the Court construed a brief Plaintiffs filed as a motion for consolidation. The Court also approved a stipulation the parties filed to extend Defendants' time to respond to that motion. Thus, the question as to whether two or more of the Group A cases should be consolidated for trial must still be briefed and decided. In addition, dispositive motions and pre-trial motions, including *Daubert* motions and motions *in limine*, must still be filed and ruled on. Accordingly, because of the work remaining on all sides, the Court once again took the middle road.

Each side was directed to select one case for trial in December 2017, followed by another case for trial in January 2018. The case selected by Defendants' counsel will be tried first, immediately followed by the case selected by Plaintiffs' counsel. The sequence will be reversed in January 2018. The Court further converted the November 27, 2017 trial date into a hearing on trial-related and dispositive motions.

## III. CONCLUSION

For the reasons stated on the record, and as further explained above, the Court granted in part and denied in part Defendants' motion to extend fact discovery deadlines and trial dates. Deadlines are imposed to force counsel and their parties to comply. But deadlines will mean nothing if courts do not adhere to them. Defendants' motion was filed late, after fact discovery should have ended. Further, rather than retain additional counsel or separate counsel, Hess and HOVIC have proceeded as if the Court did not open a master case to manage more than one hundred cases simultaneously. Deciding how to staff these cases was entirely within Hess and HOVIC's control. However, they cannot be rewarded with a continuance on the eve of trial because they did not dedicate sufficient resources before trial. Thus, Defendants have not shown good cause for extending discovery by six to nine months and extending the trial date by another six to nine months thereafter *for all Group A cases*.

Nevertheless, Defendants have shown good cause for a brief continuance in some of the Group A cases. Whether to consolidate two or more cases for trial has not been decided yet. Furthermore, work still remains for the parties and the Court before any of the Group A cases are ready for trial. Accordingly, to accommodate all sides, the Court directed that two cases go forward in December, followed by another two cases in January. In this way, Defendants get additional time for the remaining Group A cases, four of the twelve Plaintiffs get their day in court, and the Court still retains control over its docket.

An appropriate order follows.